HENRY RENFELDT, Appellant, v. BRUSH-McWILLIAMS COMPANY, a Corporation, and the Western Bankers Investment Company, a Corporation, Respondents.

(176 N. W. 838.)

**Contracts — rescission on grounds of intoxication at time of signing.**

1. To rescind a contract upon the ground of intoxication of the maker, the evidence must disclose that he was in such a degree of intoxication, at the time, so as to thereby render him entirely incapable of understanding the nature and effect of the transaction.

**Contracts — rescission — intoxication must be such as to render party entirely incapable of understanding the nature and effect of the transaction.**

2. In an action to rescind certain contracts, notes and mortgages, made in connection with the sale of land, upon ground of intoxication, it is *held*, upon the record, that the evidence does not affirmatively show that the maker was so intoxicated, as to make rescission, under the rule stated.

Opinion filed January 16, 1920.   Rehearing denied March 15, 1920.

Action of rescission in District Court, Ward County, *Leighton, J.* From a judgment of dismissal, the plaintiff has appealed and demands a trial de novo.

Affirmed.

NOTE.—That a person cannot escape liability upon a contract upon the mere ground that he was intoxicated at the time of its execution, unless it is proved that he was so intoxicated that he was unable to understand the nature of the contract and the consequences, will be seen by an examination of the cases collated in notes in 54 L.R.A. 440; 25 L.R.A.(N.S.) 596; and L.R.A.1915B, 1121.

On degree of intoxication which will afford grounds for rescission of a contract, see note in 107 Am. St. Rep. 536.

*Halvor L. Halvorson* and *Greenleaf & Wooledge,* for appellant.

An agreement, other than for necessities, made by a person when so drunk as to be incapable of understanding its nature and effect, is voidable at the intoxicated person's option. Johnson v. Harmon, 94 U. S. 371, 24 L. ed. 271; Thackerah v. Haas, 119 U. S. 449, 30 L. ed. 486; Conley v. Nailor, 118 U. S. 127, 30 L. ed. 112, 6 Sup. Ct. Rep. 1001; Cecil v. St. Dennis, 14 Pa. 184; Straughan v. Cooper, 41 Okla. 515; French v. French, 8 Ohio, 214.

Courts of equity will interfere and rescind such contracts not alone on the ground of intoxication and incapacity to contract, but upon the ground of fraud. Calloway v. Witherspoon, 40 N. C. (5 Ired.) 128; Burch v. Scott, 168 N. C. 502; Hotchkiss v. Fortson, 7 Yerg. (Tenn.) 67; Crane v. Conklin, 1 N. J. Eq. 346.

The contract will be avoided or voidable if the person, at the time of its execution, was so far under the influence of intoxication as to be unable to understand the nature or consequence of his acts and unable to bring to bear upon the business at hand any degree of intelligent choice or purpose. Cook v. Bagnell Timber Co. 78 Ark. 47; Pickett v. Sutter, 5 Cal. 412; Curtis v. Kirkpatrick, 9 Idaho, 629; Bates v. Ball, 72 Ill. 108; Wilcox v. Jackson, 51 Iowa, 208, 1 N. W. 513; Drefahl v. Security Sav. Bank, 132 Iowa, 563, 107 N. W. 179; Kuhlman v. Weiben, 129 Iowa, 188, 2 L.R.A.(N.S.) 666, 105 N. W. 445; Spoonheim v. Spoonheim, 14 N. D. 380; Powers v. King, 18 N. D. 600.

*Bradford & Nash,* for respondents.

BRONSON, J. This is an action to rescind a contract, certain notes, and mortgages, upon grounds of intoxication. In the trial court, judgment was rendered dismissing the action. The plaintiff has appealed and demands a trial de novo. Substantially the facts are as follows:

The defendants are corporations, somewhat closely affiliated, engaged in business in Minot. For some four years, prior to the transaction involved herein, the plaintiff had rented and farmed a large farm near Minot, leased to him through the defendants, Brush-McWilliams Company. This defendant was his financial adviser. For some time also, anterior to the transaction herein, the plaintiff had conducted a coal and feed business at Minot.

45 N. D.—15.

Some four years before the transaction herein, one Boden and one Bustard had acquired an interest in a half section of land (the land involved herein), through the Brush-McWilliams Company.

In February, 1916, the plaintiff and Boden had negotiations concerning the sale of this half section of land and the coal and feed business of the plaintiff. At the time Boden and Bustard were indebted to the defendants in an amount exceeding the consideration demanded for the land. The plaintiff bought the land for the consideration of $14,000. The defendants financed the transaction. The plaintiff and Boden, in their testimony, claim that the transaction was to and through the Brush-McWilliams Company, as principal. The defendants claim in their testimony that they acted solely as middlemen in financing the transaction.

In any event, the transaction was accomplished by the plaintiff assuming a $5,000 mortgage on the land, executing promissory notes for $8,000 secured by a second mortgage upon the land and a chattel mortgage upon the defendant's personal property, running to the defendants, and by turning over an order for $1,000 upon Boden and Bustard to the defendants, the consideration for the sale of his coal and feed business. Boden and Bustard delivered a deed of the land to the defendants. They, with authority, as they assert, filled in the name of the plaintiff as grantee therein and recorded the same; Boden and Bustard were released, by or through the defendants, of securities and obligations held by them, to the amount of $14,000.

These negotiations and transactions occurred approximately between the dates February 26, 1916, and March 3, 1916. On February 28, 1916, a written agreement was made by Boden and Bustard to transfer the land to the Brush-McWilliams Company for a consideration of $14,000 to be paid by the company assuming the mortgages and encumbrances, in that amount on the premises. On the same date, another written agreement was made by the Brush-McWilliams Company to transfer such land to the plaintiff for a consideration of $14,000. Likewise on the same date such company made a written agreement to furnish the plaintiff, in case it should be necessary, for the season of 1916, sufficient money for seed and for living expenses. On the same date, the notes and mortgages were made. On February 29, 1916, the deed was executed. On the same date a written agreement was

made between Boden and Bustard and the plaintiff to sell the coal and feed business for $1,000 plus the inventory price of the coal ,and feed stock. On this same date the order for $1,000 was given by the plaintiff. Boden and Bustard paid the defendants the amount remaining due from them on their indebtedness. The plaintiff then received from Boden and Bustard $486.71 for the inventory price of the coal and feed stock. Other details of the settlement were then adjusted.

The plaintiff alleges and asserts that the record discloses drunkenness on his part, existing at the time these negotiations and transactions took place, to such an extent as to demonstrate legally the inability of. the plaintiff to understand and comprehend the transactions had; that by reason thereof rescission should be permitted through advantage and overreaching obtained on the part of the defendant; that, in any event, the record further discloses such undue influence and undue advantages taken of the plaintiff as to warrant rescission.

The record amply shows that the plaintiff at the time of the negotiations and for a considerable period of time, anterior thereto, was and had been a drinking man; that both Boden and the plaintiff were indulging considerably in the use of intoxicating liquors through the period of negotiations. There is some testimony in the record that the plaintiff did not know what he was doing and that he was quite drunk at the time of these negotiations, but the testimony concerning the intoxication of the plaintiff, so far as it affected his ability to understand and comprehend what he was doing, must be considered in the light of the surrounding circumstances. His wife testifies that when she signed the notes the plaintiff was there; that he was then drunk; that he had been nothing but drunk for two years straight; that she had not seen him very much more sober for two years than he was that day; that he was always drunk. The record does disclose that the plaintiff was able to get about; that he discussed these negotiations with an attorney (not his attorney); that they proceeded for many days. In accordance with his own testimony, during these negotiations and prior to the time the contracts and papers were signed, he went out .to see the land with a view to purchasing it. He says then that he was practically sober; that he talked with Boden of the consideration; that the amount was $14,000; that he went to see the Brush-McWilliams

Company to finance it, and that they promised to finance it. These acts do not show deprivation of reasoning or understanding.

Shortly after these negotiations, in accordance with the plaintiff's testimony, he became sober or more sober; he went out to take a look at the land; he discovered that he had made a poor deal; he went to see the defendants and told them that he wanted to back out. The defendants offered then to give him another quarter section of land out in the hills, but this was not satisfactory. Later, on April 3, 1916, he caused to be served, in writing, a notice of rescission.

It is deemed unnecessary to review in detail the evidence concerning the manner or extent of the plaintiff's drinking: The sole ground for rescission, upon this record, is primarily based upon intoxication of the plaintiff, existing at the time of the negotiations. In the proof we are satisfied that there exists no ground for a finding of unconscienable conduct, or overreaching, unless it be upon the ground of plaintiff's intoxication.

The trial court, in a memorandum letter, has, in effect, found that the grounds of rescission, on the part of the plaintiff, even though they existed, applied only to Boden and Bustard, and not to the defendants, who agreed to finance the plaintiff in this deal. We, however, are of the opinion that the grounds of intoxication are sufficient, if established, to apply to the obligations of the defendants as well as to the contract obligations, if any, with Boden and Bustard.

In previous cases, this court has laid down the rule that to set aside a contract upon grounds of intoxication, it must be shown that the person was so intoxicated as to be incapable of understanding the nature and effect of the transaction. In effect, his drunkenness must be so excessive as to utterly deprive him of his reasoning and understanding, and so as to render him incapable of knowing the effect of what he was doing. Any degree of intoxication less than this affords no grounds for release in the absence of fraud on the party of the other party. Power v. King, 18 N. D. 600, 602, 138 Am. St. Rep. 784, 120 N. W. 543, 21 Ann. Cas. 1108; Spoonheim v. Spoonheim, 14 N. D. 381, 104 N. W. 845. Upon this record, reviewing the same for purposes of a new trial, we are of the opinion that the plaintiff has failed to so establish sufficient grounds of excessive drunkenness existing at the time so as to permit rescission, under the rule stated.

Judgment of the trial court, therefore, should be and is affirmed, with costs to the respondents.

CHRISTIANSON, Ch. J., and BIRDZELL, J., concur.

GRACE, J. (dissenting). The plaintiff brought this action to rescind the contract. The testimony in this case shows the following facts or circumstances, from which the existence of the fact is naturally and irresistibly inferred. It shows, indisputably, that plaintiff, for a period of two years or more prior to the time of the transaction in question, was an habitual drunkard; that this fact was known to the defendants, with whom he had continuously done business during that time. He had rented a large tract of land from them, had deposited his money with the First International Bank, and his transactions with all of them were so numerous that they knew him thoroughly and well. They knew that he was an habitual drunkard.

The testimony of Boden shows that, during the 27th, 28th and 29th of February, 1916, plaintiff was drunk all the time; that he was drunk to such an extent that his judgment would not be very sound.

This question was asked Mr. Boden:

Q. Did you get him drunk for the purpose of sloughing this land onto him?

A. Well, I could answer that awful good, but I do not believe I want to.

Q. Could you answer it truthfully?

A. Yes, sir, I could.

Q. Go ahead and answer it.

A. Well, I do not think it would do any good to answer it.

The Court: We would like to have the facts.

A. It simply did not amount to anything, I don't think. I think it would just—

The Court: Let me judge that.

A. Well, sir, I did.

This question was asked H. J. Halvorson, an agent or officer of the defendants:

Q. Did you have anyone acting for you outside of your officers, out-

side of your own company, in this transaction with Mr. Renfeldt?

A. Boden.

Mrs. Renfeldt, defendant's wife, went into Brush-McWilliams Company to sign some papers in connection with the deal. She testified that Henry (her husband) was there at the time. This question was asked her:

Q. What condition was he in?

A. He was drunk; he had not been nothing but drunk for two years straight.

Q. Was he drunker than usual?

A. Well, I never saw him sober for two years.

Q. You saw him more sober for two years than he was that day?

A. Not very much; he was always drunk.

Q. You know he was drunk at that time?

A. I know he was drunk; awful drunk.

Q. Did anyone else state that he was drunk, to you?

A. Nobody there, I guess; I do not think so.

Q. Who was present when you signed the papers, if you remember?

A. That fellow in the bank.

Q. What is his name? Fred Anderson?

A. A big tall fellow in the bank.

Elmer Evanson, who was employed by Renfeldt in the coal yard, testified as follows:

Q. Did you see him (Renfeldt) during the three of four days while they were dealing on the coal yard, and the different interests?

A. Yes, sir.

Q. See him with Boden at times?

A. Yes, sir.

Q. See him when Boden was not with him?

A. Yes, sir.

Q. Several times a day?

A. Yes.

Q. During the 27th, 28th, and 29th of February?

A. Yes.

Q. Was he drinking or sober during that period?

A. Drunk.

Q. Well, was he drinking or was he drunk almost to stupefication?

A. Why, he was able to walk, but pretty drunk.

Q. *Too drunk to act rational and use judgment, was he, in your opinion?*

A. *In my opinion, he was.*

Q. You figure that he could not judge the effect of a business transaction, involving the transfer of properties, and signing of notes, in the condition he was during three days?

A. I do not think he could.

Q. That is your opinion, based on observation of him?

A. Yes, sir.

Q. You say you were working for him at his coal yard?

A. I was working for him.

Q. You saw him a good many times each day?

A. Four or five times each day; sometimes, more than that.

Q. In the evening, too?

A. Yes, sir.

In cross-examination, the defendant was asked this question:

Q. You have no recollection of having made this deal at all?

A. Some, yes.

Q. Will you tell just what recollection?

A. I could not do it; it seems like a dream.

Q. Just like a dream?

A. Yes.

Some more of his testimony on the cross-examination is as follows:

Q. Now, you recollect the day that the settlement was made between Mr. Boden and the bank?

A. No, sir.

Q. You were right there in the bank, at the time it was made, wasn't you?

A. I do not think so.

Q. And didn't yourself and Mr. Boden and myself go from there down to your office, and proceed with a settlement on the coal business?

A. Not that I remember of.

Q. And did not we go from there to Bob Gillespie's office, and there, close it up, finding out about insurance, etc., and then did I not give you a check for something like $400, in settlement of it?

A. I do not remember of it.

Q. You do not remember anything about it?

A. No, sir.

Q. Do not remember now of receiving that check?

A. No, sir.

Q. Do not remember of signing it?

A. No, sir.

Q. Have you no recollection of it at all?

A. No, sir.

Q. And you have no recollection of talking about a certain kind of coal down there, known as black diamond coal?

A. Never paid no attention to it. Mr. Dill was doing my business.

Q. You did not have any conversation with Mr. Boden or him, about those propositions?

A. I might have had some kind of conversation; I do not remember it.

Q. You and Mr. Boden did not go over to Bob Gillespie's office?

A. I do not remember of ever being in his office with you, at all.

Q. *You do not, you do not—you did not make that settlement your-self, without the aid of Mr. Dill, at all, over at Gillespie's office?*

A. *Not that I remember of.*

Q. And you have no recollection of being in the bank that after-noon, when the settlement was made in the bank, between Mr. Boden and the Brush-McWilliams Company?

A. I have a kind of a slight recollection of being there off and on.

Q. Was your wife there that day?

A. She was there one day; I do not remember which day.

The answer of the defendants alleges that the plaintiff is a constant user of intoxicating liquors, and alleges that a serious quarrel with the members of his family was caused by his habitual use of liquor.

It appears, therefore, that the defendants had full knowledge and notice, and well knew, of the fact that the plaintiff was an habitual drunkard.

In the face of all the foregoing testimony, any testimony introduced by defendants, seeking to show that plaintiff was in a mental condition to do the kind of business transacted at the time the notes and mort-gage in question were executed, is entitled to no credit. It indisputably

appears that the plaintiff was an habitual drunkard, and that he was so drunk at the time of the execution of the notes and mortgages in question that he could have had no judgment or understanding.

Some four years prior to this transaction, Boden and one Bustard had acquired an interest in this land, through Brush-McWilliams Company. At the time of this transaction it was claimed that Boden and Bustard were indebted to the defendants, in the sum of $14,000 or more; the findings of fact of the trial court also shows this. In connection with this, however, it is well to cite some of Boden's testimony given in cross-examination.

Q. Mr. Boden, at the time you made this deal with Mr. Renfeldt, you were in the position where you had to sell this land?

A. No, sir, I did not have to sell.

Q. Is not it a fact, Mr. Boden, that that was practically the only chance you had in order to save your personal property?

A. Yes, it was, but they could not force me to sell it.

Q. They could not force you to sell it?

A. They tried to, and could not.

Q. But they could foreclose on your property?

A. Yes, I wanted them to do it, but they would not.

Q. You wanted them to foreclose their real estate mortgage?

A. Yes.

Q. You preferred to have these mortgages foreclosed rather than to sell the farm?

A. Rather than to settle the way they wanted to settle.

Q. That was prior to that time?

A. Yes.

Q. The sale, however, that you carried through, was satisfactory in every way?

A. Certainly.

Q. And there has been considerable talk of forcing you on the debts, and foreclosing the mortgage before that day?

A. I have tried to get them to do it, but they would not do it.

Q. You had tried to get them to do it?

A. Yes, sir.

Q. You mean to testify here in this court that you had tried to get

them to foreclose the mortgage, and they would not do it, told them to do it, and they would not do it?

A. Yes, sir.

Q. And you were on unfriendly terms with them?

A. No, sir, not at that time.

The defendants seek to show and assume the position that they had no interest in the deal, other than to finance it for Boden and Renfeldt. As we view the evidence, there was no deal between Boden and Renfeldt, and the defendants had a very material interest other than financing the deal, for the accommodation of the parties.

It appears, from Boden's testimony above, that there was very serious difficulty between him and defendants. Just what that difficulty was, the evidence does not disclose. But, from the statements of Boden, the only inference that can be drawn is that they were not in position to enforce their claims against him; that they did not dare to realize upon their securities they had against him, for his evidence shows he had requested them to do so; rather invited and welcomed an opportunity to have them endeavor to realize upon their securities. Their motive, then, it would seem, in bringing about this deal, Boden acting for them, was to relieve themselves of an unpleasant condition in which they found themselves with Boden.

Boden must have been a man who knew his rights and dared to maintain them, and the only conclusion and inference that can be drawn from his testimony is that these defendants did not dare to proceed against him. If, however, he could be released from his deal, and get out of the unpleasant condition, in which he undoubtedly found himself, by co-operating with the defendants, to saddle the deal on Renfeldt, he, of course, could have no further complaint against them; but the fact that after he did get released from his deal, and then testified as is shown above, demonstrates that his feeling is very deep against them, and must have rested upon some very substantial reasons.

As we view the matter, there is no merit in the claim of Brush-Mc-Williams Company, that they were merely acting to finance the deal. It is, on the other hand, very apparent they were acting in their own interest; they were making the deal for themselves, and Boden was acting for and with them, to assist them in making the deal. They were

primarily interested in the deal, and it was between them and Renfeldt, and not between him and Boden.

This case is before this court for trial *de novo;* it is a case in equity. It may be well, therefore, to state concisely the equities of the case. There is competent testimony to show that the land in question, at the time of the transaction, was not worth more than $8,000. There is other testimony which shows it to be worth more, and perhaps some which places a value upon it as high as $14,000. We think it is clear, from the testimony, that the land at that time was not worth more than $8,000.

Let us assume, for the purpose of illustration, that it was worth $14,000. Brush-McWilliams Company got the land back from Boden. There was a $5,000 mortgage against it, and that left an equity in the land, in their hands, of $9,000. They claim to have sold the land to the plaintiff for $14,000. They took his notes, secured by a mortgage, on the land, and all the personal property, for $7,000, and he turned in $1,000 from the coal business, and he was to pay $1,000 cash. In other words, he secured them in their full equity in the land $9,000.

Shortly after the time of the transaction, the plaintiff had to move off the Kelly place; he absolutely refused to move to the land in question, and did not do so. It seems, however, that Mr. Halvorson acted for the defendants, or some of them, and made a deal with Mrs. Renfeldt to move to the place, and guaranteed to pay her for all the work she might do thereon. It appears that she was acting as their agent, and taking care of the personal property, etc.

As we understand the testimony, and as we remember the statements made in the argument, before this court, all the mortgages have been foreclosed, so that the plaintiff has nothing left; all of his personal property and interest in the land has been taken away from him. He has no further interest in any of it. His personal property was worth about $8,000; his coal business, $1,000; he has thus lost $9,000.

Assuming the land to be worth $14,000, if the defendants had taken all the personal property and given him credit therefor, for the proceeds of the coal business, and the cash payment, if it were paid, he would owe only $5,000 on the land; he would have something left, some hope for the future; but, as we understand the situation, everything is gone, personal property, land, and all.

There is another loss he sustained, and which is irreparable.    There is not a word of testimony in the record to show that prior to the time of making this deal, Renfeldt ever had any difficulty with his family. There is testimony that he drank intoxicating liquors, and was drunk for a period of two years, but not a syllable of testimony that during any of that time, or any time until after the present transaction, that he, in any manner, abused his family.    In the state of the record, it must be assumed that there never had been any prior trouble.

Just as soon as Henry Renfeldt had finally sobered up and came out of the excessive drunken condition he was in, at the time he made this deal, and as soon as he realized what he had done, and when influence had been brought to get his family to move to the farm, trouble commenced in his home, and it never ceased until it terminated in a divorce from his wife.    In other words, the entire family has become separated, and Henry Renfeldt is left stranded and alone upon the sands of time, to eke out the balance of his existence.    This position is quite in contrast to that in which he was at the time, at the defendants' offices, he signed the notes, etc., while so drunk as to have no judgment or understanding, or to know and realize the consequences of his act.

The evidence clearly shows that he was in such a drunken condition, at the time of the transaction, that he could not exercise any free will or act, nor was his mentality such that he could know the consequences of such act.    He was in no more condition to do business than if he had been violently insane.

When it is considered that the plaintiff had been drunk, *continuously drunk, for two years,* such drunkenness must not be looked upon alone as a reckless habit, but, in such circumstances, it becomes, and is, a disease, the ravages of which could no more be stayed by Henry Renfeldt than the progress of any other disease; and it is in this sense that the law throws its protection around such people.

As we view this testimony, Renfeldt, on the day or days of the transaction, was as dunk as one could be and be able to stand or navigate; if he were any drunker, he would have become unconscious or passed into a drunken stupor; and hence notes, mortgages, contracts, or whatever were signed by him, while in that condition, were of no effect, were absolutely void, for he had no capacity to contract.    He could not understand the nature and effect of the transaction; he could not compre-

hend the consequences and effect of his acts. He was in no sense in such mental condition as to comprehend and understand the nature and effect of the large transaction, into which he was drawn, and events, which took place subsequent to it, unmistakably show this to be true.

After he had sobered and realized that he had made such a deal, he was crushed in spirit. He knew that he was wrecked and ruined financially, and he did the only thing that was left him, and that was to try to rescind the whole transaction.

This court of conscience should not look with favor upon this transaction; neither should it place thereon its stamp of approval. It should not close its eyes to the great injustice that has been done the plaintiff; it should not be deaf and dumb to his appeals for justice, and for the defense of his rights in his property. It should, by its decree, set aside the whole transaction, and compel these defendants to return plaintiff his personal property, and every dollar they secured him to put in this deal. He should be placed again at the point where he was when, in his drunken condition, he entered into this transaction. Nothing else will be justice.

If this were done, in what position would it leave defendants? They would not be out a single cent. They had sold the land to Boden, and held his paper and securities for $14,000. When they canceled his obligations, they got the land back. It must be assumed, therefore, they had no loss in that transaction. If the transaction of Renfeldt is rescinded, they will still have the land; they would not be out a single dollar. The only difference is, there would be no sale of the land. If, however, they now have the land, and are permitted, in addition to that, to retain $9,000, paid them by Renfeldt in property, etc., they are that much the gainers.

This court of equity should not approve this transaction. Every principle of justice and equity pleads in favor of the plaintiff. Law, and especially equity, should protect the weak.

In this transaction, on the one hand, were these defendants, corporations, whose officers and agents are intelligent, resourceful, active, and skilled in their business, and, at the time of this transaction, were in position to, and did, use such qualities in the completion of the transaction.

On the other hand, at the time of the transaction, the plaintiff was a

weak, drunken, unintelligent, and incompetent man, wholly unfit and incapable of entering into a contract of this character; and, as we view the testimony, could not and did not know the effect and consequences of such an act.

In these circumstances, equity should protect the plaintiff. His extreme weakness and total incompetency, at the time of the transaction, should not be permitted to result in such an extraordinary advantage to these defendants.

This court of equity should not exercise its powers to protect the acts of the strong against the weak, especially where that act is one which does not appeal to equity and good conscience, and, as we view the acts of the defendants, they certainly do not.

The fact that the defendants are strong business concerns, exercising great power in the life of their business community, and that the plaintiff, on the other hand, was an habitual drunkard, whose weakness was well known to the defendants, and which was taken advantage of, as the evidence shows, by Boden, the agent of defendants, designedly procuring his excessive drunkenness for the purpose of sloughing this land upon him, should not place the cause of defendants in a more favorable light before this court.

When the strong oppress the weak and incompetent, and take unjust and undue advantage of them, where wrong seeks mastery over right, justice should prevail, and the restraining hand of equity should intervene to protect the weak from such oppression and injustice.

In the name of the spirit of our jurisprudence, which affirms the equality of each, before the law, in the name of right, truth, and justice, in the name of equity and good conscience, I dissent from the conclusion and decision arrived at by the majority of my associates.

ROBINSON, J. (dissenting). I concur with all possible emphasis in the able dissent of Mr. Justice Grace. The Brush-McWilliams deal was clearly unconscionable. The plaintiff should not be robbed of some $8,000, even though he was not very drunk when induced to sign the cut-throat contract.